[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-14836
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 22, 2011
JOHN LEY
CLERK

D.C. Docket No. 8:10-cr-00167-RAL-MAP-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MANUEL A. WALCOTT,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 22, 2011)

Before TJOFLAT, CARNES  and HULL, Circuit Judges.

PER CURIAM:

Following a jury trial, Manuel A. Walcott ("Walcott") appeals his

convictions for enticing, and conspiring to entice, a minor to engage in a

commercial sex act, and enticing a minor to engage in sexually explicit conduct

for the purpose of producing visual depictions of such conduct. On appeal, Walcott contends that the district court erred when it: (1) refused to give a "missing witness" jury instruction regarding Walcott's co-defendant Pasquale Holt ("Holt"); (2) did not allow Walcott to comment more expansively at closing argument on the government's failure to call Holt; and (3) failed to require the government to grant Holt use immunity or, in the alternative, to dismiss the indictment. After review of the briefs and record, we affirm.

## I. BACKGROUND AND PROCEDURAL HISTORY

On April 21, 2010, the grand jury issued an indictment against Holt and Walcott. Count One alleged that, in or about January 2009, Holt and Walcott conspired to entice a minor ("M.S.") to engage in a commercial sex act, in violation of 18 U.S.C. §§ 1591(a)(1), (b)(2), (c), 1594(c). Count Two alleged that, in or about January 2009, Holt and Walcott enticed a minor to engage in a commercial sex act, in violation of 18 U.S.C. §§ 2, 1591(a), (b)(2), (c). Finally, Count Three alleged that, on or about January 26, 2009, Holt and Walcott enticed a minor to engage in sexually explicit conduct for the purpose of producing visual depictions of such conduct, in violation of 18 U.S.C. §§ 2, 2251(a), (e).[1] Holt pled

---

[1]There was a fourth count in the indictment charging Holt with possession of child pornography. That count is not at issue here.

guilty to Count Two pursuant to a plea agreement, while Walcott proceeded to trial.

## A. Pre-Trial Proceedings and Walcott's Opening Statement

Before trial began, Walcott discovered that, while in prison, Holt made a number of telephone calls that purportedly called into question Holt's trustworthiness. If the prosecutor called Holt as a witness, Walcott intended to use these phone calls on cross-examination to impeach Holt's credibility.

During his opening statement, Walcott's counsel discussed Holt's plea agreement and noted that the government dismissed all but one charge. He told the jury that "Pasquale Holt was the leader of this prostitution ring" and that Holt would testify to that effect. Walcott's counsel also said that "if the Government chooses not to call Mr. Holt, I promise you I will, and I will ask him and he will tell you that [he was the leader of the prostitution ring]." After this opening statement, the government stated that it had not yet decided whether to call Holt as a witness.

## B. Government's Evidence at Trial

The government's first witness was M.S., the minor victim of the crimes. M.S. testified that Holt introduced her to Walcott in a hotel room at the Days Inn where Walcott's girlfriend and another woman named Erica Licata ("Licata") were

3

present. The group smoked marijuana together. Then Holt and Walcott took nude pictures of the women, with Holt using a cell phone and Walcott using a silver digital camera. M.S. did not know what the pictures would be used for.

The group left the hotel, with M.S. thinking they were going to get food. Instead, they drove to another hotel, which M.S. testified she thought was the Marriott. When the group arrived at the new hotel, Holt asked M.S. to be a prostitute, and Licata further discussed the idea with M.S. Holt and M.S. had not previously discussed the idea of M.S. becoming a prostitute. M.S. and Licata met a man who they thought was a client at the Marriott, and M.S. intended to rob him rather than have sex with him. M.S. and Licata entered the man's room and he offered them $300 to perform a sex act. When the two accepted the money, the man revealed himself as an undercover agent, and he and his colleagues arrested them.

Licata testified next. Licata testified that she worked as a prostitute and met Walcott and Holt in January 2009 through Walcott's girlfriend, Shontia Johnson ("Johnson"),who was also a prostitute. Licata testified that, as a prostitute, her pimps posted pictures of her on the Internet, and that she did not know how to post those pictures. After Licata met Walcott and Johnson, they agreed to help Licata make money as a prostitute by putting ads on the Internet and answering the phone

4

to take appointments for her. The night Licata met Holt and Walcott, Licata spent the night with Holt at his apartment. The next day, Holt introduced her to someone he called "Grumpy," his nickname for M.S. Licata told Holt that she was nervous about how young M.S. looked, and Holt told her that M.S. would be eighteen in three months. Holt told Licata that she "would need to train [M.S.] since [Licata] ha[d] experience and that, basically, [Licata] would have to teach [M.S.] the ropes [of being a prostitute]." Licata thus took on the task of managing M.S. for Holt.

Later that same day, Licata wound up in a hotel room with M.S., Johnson, Walcott, and Holt. Holt and Walcott took pictures of M.S. and Licata in the hotel room. A call came in from a client "for 300 [dollars] for two girls." Walcott drove M.S. and Licata to the hotel where this client was staying; Holt and Johnson, among others, were also passengers. When the group arrived at the hotel, M.S. and Licata went to the client's room and the client paid them $300 to perform a sex act. Once the client handed over the money, there was a knock on the door, and the FBI came into the room.

After M.S. and Licata's testimony, the government told the district court that it did not plan to call Holt as a witness. Walcott told the district court that he planned to call Holt. Walcott asserted that the government did not plan to call

Holt because Holt's testimony would present problems for the government's case and because the government wanted to prevent Walcott from bringing up "extrinsic evidence of specific conduct on cross-examination," namely details of some of Holt's prison phone calls.

Holt's counsel, however, told the district court that Holt intended to invoke his Fifth Amendment privilege against self-incrimination and that Holt would not testify if called by Walcott. The district court allowed Walcott to comment on Holt's failure to testify during closing argument, but denied Walcott's request to force Holt to invoke the privilege in front of the jury.

Holt later took the stand outside the presence of the jury. Walcott indicated that he wanted to ask Holt about, inter alia, the events on January 26, 2009, when Holt acted as a pimp for Licata and M.S.; Holt's calls from jail; Holt's plea deal with the government; and why Holt was not prosecuted for having sex with M.S. Holt indicated that, if called by Walcott to testify, he would invoke his Fifth Amendment privilege against self-incrimination. The district court declined, "in [its] discretion," to have Holt invoke his Fifth Amendment right on the stand in front of the jury. Holt did state that, if called by the government, he would testify "[i]n accordance with [his] plea agreement."

C.  **Jury Instructions**

6

After both sides rested, the district court went over the jury instructions. Walcott told the district court that, during his closing argument, he wanted to comment to the jury about the government's failure to call Holt. Walcott explained that, during his opening statement, he made several "pretty bold" statements about the evidence in the case, particularly about what Holt would say, and that Holt would no longer be testifying.

In response, the government stated that it did not mention Holt during its opening statement, and that it had not mentioned anything Holt said over the course of the proceedings. The government asserted that any promises Walcott made about Holt's testimony were simply mistaken trial strategy. The district court asked whether the fact that Holt would testify if called by the government, but not by Walcott, was "a little bit fundamentally unfair?" The district court also asked whether Holt was "under [the government's] control," and rejected the government's contention that Holt was not under its control.

Following this discussion, Walcott filed his proposed "missing witness" jury instruction:

> It was particularly within the power of the government to produce Pasquale Holt as a witness who could have given material testimony on an issue in this case. The Defendant Manuel Walcott cannot call Pasquale Holt as a witness. The government's failure to call Pasquale Holt as a witness may give rise to an inference that his testimony would be unfavorable to the government.

Walcott argued that the instruction was appropriate because Holt was peculiarly within the control of the government, in that he would testify if called by the government, but would invoke his Fifth Amendment rights if called by Walcott.

According to Walcott, when a witness is peculiarly within the control of one party and could give testimony that would elucidate the transaction, the fact that the witness does not testify gives rise to the presumption that the testimony would be unfavorable to the party in control of the witness. Walcott buttressed his claim that Holt's testimony would be unfavorable to the government by asserting that Holt's jail-cell telephone calls would undermine the government's case and cast doubt on Holt's motives for cooperating. While Walcott conceded that he did not know why the government failed to call Holt, he asserted that "the defense stated unequivocally that it believed the testimony of Pasquale Holt would in fact be favorable to its case and went to great measures to elicit this testimony." Walcott did not further explain why Holt's testimony would help him.

In court the following morning, Walcott argued that Holt's testimony would add to the government's case (i.e., that his testimony would not be cumulative) because Holt was allegedly "present every step of the way and conspired with [Walcott] to commit [the] crimes [at issue]." Walcott implied that the government did not call Holt because of "the problems he has in terms of other issues that will

cast doubt on his credibility and his truth [sic] worthiness." If Holt testified, Walcott's plan was to ask him about the substantive offenses, then to impeach him. Walcott also argued again that Holt should be forced to invoke his Fifth Amendment rights in front of the jury.

After considering these arguments, the district court did not revisit its ruling that Holt would not have to invoke his Fifth Amendment privilege in front of the jury. It also declined to give a "missing witness" jury instruction of the type proposed by Walcott, but did allow Walcott, in closing argument, to ask the jury why Holt was not called by the government. The district court, however, did not allow Walcott to say that he was not allowed to call Holt.

The district court called Holt as its own witness to "put before this jury he's pled guilty based on a plea agreement with the Government" and thereby allow Walcott to comment on the guilty plea and plea agreement in closing argument. During closing arguments, Walcott asked the jury why Holt had not testified, and called the jury's attention to Holt's plea agreement. In rebuttal, the government addressed the issue of its failure to call Holt, suggesting that it did not need to call Holt to prove its case. The government further implied that Holt would not undermine its case because he would not testify that its other witnesses were lying when they testified.

9

Before the jury charge, Walcott requested his "missing witness" instruction one final time, and the district court again declined to give it. The jury found Walcott guilty on all charges.

## II. DISCUSSION

### A.    Missing Witness Jury Instruction

We review the district court's refusal to give the "missing witness" jury instruction for abuse of discretion. See United States v. Link, 921 F.2d 1523, 1529 (11th Cir. 1991). "For the denial of a requested jury instruction to be reversible error a defendant must show that the instruction: (1) was a correct statement of the law; (2) was not adequately covered in the instructions given to the jury; (3) concerned an issue so substantive that its omission impaired the accused's ability to present a defense; and (4) dealt with an issue properly before the jury." United States v. Dulcio, 441 F.3d 1269, 1275 (11th Cir. 2006) (quotation marks omitted).

This Court previously has addressed the "missing witness" jury instruction. In United States v. Nahoom, 791 F.2d 841 (11th Cir. 1986), we stated that "[w]hen a witness is peculiarly within the control of one party, and the witness' testimony would elucidate facts in issue, an instruction is appropriate regarding the permissible inference which the jury may draw from the party's failure to call the

10

witness." Id. at 846  Additionally, before the jury instruction can be given, the party requesting it "must establish the potential witness' unavailability in a physical or practical sense" and "the potential testimony must be relevant and noncumulative." Jones v. Otis Elevator Co., 861 F.2d 655, 659 (11th Cir. 1988). In Link, we clarified our "missing witness" instruction jurisprudence by ruling that "[w]e are aware of no authority requiring the giving of a 'missing witness' instruction to the jury if the so-called missing witness would testify against the interests of the defendant." Link, 921 F.2d at 1529.

In this case, Walcott has not shown that Holt's testimony would have been favorable to him, and thus we conclude the district court did not abuse its discretion in failing to present the "missing witness" instruction. See id.  Walcott argues that Holt's testimony was "likely exculpatory" because "Holt, and only Holt, could have testified as to whether he alone was responsible for posting the ad on Craigslist, and whether he alone was in control of 'M.S.' as she was indisputabl[y] one of 'his girls', and in no way under the control of or operating under [Walcott]."  While Walcott asserts that Holt was likely to testify that he was in control of M.S. because M.S. testified that she had sex with Holt and worked as a prostitute for him, these assertions in no way show that Holt would have testified that Walcott was not involved or that Holt would have testified favorably to

11

Walcott. As the government's brief points out, Walcott at trial expected that Holt would testify unfavorably, and anticipated using extrinsic evidence for impeachment purposes. Indeed, most of Walcott's arguments at trial focused on Holt's "credibility and truth [sic] worthiness," not on any favorable testimony Holt might provide Walcott. Both parties anticipated that Holt would inculpate Walcott, and that Walcott wanted Holt to take the stand only so Walcott could impeach him. Given the record before us, a "missing witness" instruction was not required.

**B.    Limitation of Comment on Failure to Call Holt**

We review the district court's "broad discretion in the management of the trial" for "a clear showing of abuse." United States v. Hilliard, 752 F.2d 578, 582 (11th Cir. 1985); see also United States v. Gabay, 923 F.2d 1536, 1541 (11th Cir. 1991) ("A trial court has broad discretion in handling a trial and an appellate court will not intervene absent a clear showing of abuse."). Thus, "the district court will not be reversed for limiting summation as long as the defendant ha[d] the opportunity to make all legally tenable arguments that are supported by the facts of the case." United States v. Gaines, 690 F.2d 849, 858 (11th Cir. 1982).

Walcott argues that, in closing argument, he should have been allowed to explicitly ask the jury to infer that Holt's testimony would have been damaging to

the government and favorable to the defense.  What Walcott wanted to argue in closing is the same as his proposed "missing witness" jury instruction.  Because there is no evidence in this record that Holt's testimony would have been damaging to the government or favorable to Walcott, the district court did not abuse its discretion in limiting Walcott's closing argument.

Moreover, Walcott was allowed to make the legal arguments supported by the facts in the case.  The district court allowed him to "argue to this jury where is Mr. Holt, why wasn't he called by the Government, and [the district court is] not going to hear from the Government saying, well, why didn't [Walcott] call [Holt]."  In addition, at numerous points in his closing argument, Walcott took the opportunity to comment on the government's failure to call Holt, for instance by highlighting Holt's plea agreement and explicitly asking, "So, why didn't the Government call Pasquale Holt to testify?"  This question, among other arguments Walcott advanced in his closing argument, allowed the jury to draw its own negative inference against the government as to what Holt's testimony might have been.  Thus, the district court's limitations on closing argument did not prevent Walcott from making "all legally tenable arguments," and in fact allowed him to repeatedly question why the government failed to call Holt to testify.  Gaines, 690 F.2d at 858.  We find no basis in the record to determine that the district court

abused its discretion in limiting what Walcott could say in his closing argument regarding Holt's failure to testify.

**C.      Grant of Immunity to Holt**

On appeal, Walcott contends that "[t]he district court erred when it failed to dismiss the Indictment against [Walcott] as the government failed to immunize Pasquale Holt as a defense witness."  We can find no instance where Walcott made this argument in the trial record, or moved to dismiss the indictment on this ground, so our review is for plain error.  United States v. Vallejo, 297 F.3d 1154, 1164-65 (11th Cir. 2002) (stating that review is for plain error when a litigant has failed to raise an issue in the district court).

To establish plain error, the appellant must show: "(1) error, (2) that is plain, and (3) that affects substantial rights.  If the preceding three conditions are met, we may exercise discretion to correct a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  United States v. McNair, 605 F.3d 1152, 1222 (11th Cir. 2010), cert. denied, 131 S. Ct. 1600 (2011) (citations and quotation marks omitted). "Before an error is subject to correction under the plain error rule, it must be plain under controlling precedent . . . ."  United States v. Lett, 483 F.3d 782, 790 (11th Cir. 2007).

14

As the government's brief points out, the error Walcott necessarily alleges is "the district court's failure to <u>sua sponte</u> compel the United States to grant Holt use immunity or to dismiss the indictment." (underline added). Walcott cannot demonstrate that this is error, much less plain error; he has provided no authority from this Circuit or the Supreme Court showing that the district court must <u>sua sponte</u> dismiss the indictment under these circumstances. Because Walcott has not cited any controlling precedent contradicting the district court's ruling, the error he assigns to the district court is neither "obvious" nor "clear under current law." <u>See</u> <u>United States v. Humphrey</u>, 164 F.3d 585, 588 (11th Cir. 1999) (quotation marks omitted).[2]

### III. CONCLUSION

For all of these reasons, we affirm Walcott's convictions.[3]

**AFFIRMED.**

---

[2]Walcott relies primarily on the Second Circuit's decision in <u>United States v. Ebbers</u>, 458 F.3d 110 (2d Cir. 2006), which addressed the issue of whether defendant-appellant Ebbers "was deprived of a fair trial when the government refused to immunize certain witnesses." <u>Id.</u> at 117. However, <u>Ebbers</u> is distinguishable in one critical aspect and instructive in another. First, nothing in <u>Ebbers</u> indicates that it was a plain error case. <u>See id.</u> at 118 (adopting an abuse of discretion standard of review for district court's refusal to force government to grant immunity to defense witnesses). Second, the Second Circuit's ruling in <u>Ebbers</u> went against the defendant-appellant "because [he] has not shown that the absence of testimony by [the witnesses] affected the total mix of evidence before the jury." <u>Id.</u> at 120. Because Walcott has not shown that Holt's testimony would have been exculpatory, Holt's testimony similarly would not have altered the mix of evidence before the jury. <u>See id.</u> at 119-20.

[3]On appeal, Walcott does not raise any sentencing issues.

15